UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★ SEP 2 8 2018 ★

BROOKLYN OFFICE

---------------------------------------------------------------- X
              :
ROLANDO CANDELARIA,         :
              :
         Petitioner,   :   **MEMORANDUM DECISION AND**
              :   **ORDER**
   – against –        :   14-cv-2876 (AMD)
              :
HOWARD D. GRAHAM, Superintendent, :
Auburn Correctional Facility,    :
              :
        Respondent.   :
              :
---------------------------------------------------------------- X

**ANN M. DONNELLY**, District Judge.

The *pro se* petitioner, currently incarcerated at Auburn Correctional Facility, petitions for

a writ of habeas corpus pursuant to 28 U.S.C. § 2254. On October 13, 2009, following a jury

trial in Kings County, New York, the petitioner was convicted of one count of Murder in the

Second Degree (N.Y. Penal Law § 125.25[1]). The petitioner claims that the prosecutors

withheld exculpatory material in violation of *Brady v. Maryland*, (ECF No. 1 at 5), and

committed other misconduct. (*Id.* at 6.) He also says that the detectives who questioned him

violated his right to counsel. (*Id.* at 8.) Finally, he attacks his counsel's performance as

deficient. (*Id.* at 9-10.) In addition, the petitioner seeks an order compelling the prosecutor to

produce certain materials, and requests a stay to exhaust additional state remedies. (ECF No.

17.) The petition for a writ of habeas corpus, the motion to compel, and the request for a stay are

denied.

## FACTUAL BACKGROUND[1]

1. Overview

On November 2, 2007, the petitioner, whose nickname was "Holy," was with friends, including someone called "Zeen." (ECF No. 9-2 at 297:6-17, 297:25-298:14, 308:19-23.) Zeen insulted Nicole London, Troy London's younger sister. (*Id.* at 117:20-118:5; *see also id.* at 34:21-35:19.) Shortly thereafter, London and his friend Brian Young confronted the petitioner and his friends; London pulled out a gun, waved it in the air, and pointed it at the petitioner. (*Id.* at 120:20-121:16, 121:25-122:8, 299:3-22.) The two groups exchanged insults, and London shot the gun in the air as he walked away. (*Id.* at 119:7-121:7, 301:7-302:19.)

Three days later, on November 5, 2007, London and Milton Lewis were sitting in a truck parked in front of London's building. (*Id.* at 42:7-17.) At one point, Lewis went into London's building, and the petitioner approached London, who was at this point standing by the truck. (*See id.* at 44:5-14, 48:25-49:8, 112:23-113:18.) The petitioner shot at London five times, hitting him three times. (*Id.* at 221:19-25, 274:20-23.) London stumbled into the lobby of his building, and told Lewis that "Holy" had shot him. (*See id.* at 48:25-50:1, 53:23-54:2.) Della London, London's mother, rushed down to the lobby, and London repeated that "Holy" shot him. (*Id.* at 24:24-25:6, 25:17-22.) London died shortly after paramedics took him to the hospital. (*Id.* at 200:2-7, 274:6-9.)

Della London told investigating detectives that her son had identified "Holy" as his killer. (*Id.* at 27:12-28:15.) The detectives subsequently learned that the petitioner was known as "Holy." (ECF No. 9-1 at 78:18-20.) They obtained the petitioner's photograph and showed it to his girlfriend, Vanessa. (*See id.* at 78:21-23.)

---

[1] Because the petitioner was convicted, I summarize the facts in the light most favorable to the verdict. *Garbutt v. Conway*, 668 F.3d 79, 80 (2d Cir. 2012).

2

On December 21, 2007, detectives received a report that the petitioner was at a house on Sixth Avenue in Brooklyn. (*Id.* at 68:6-22.) They went to the house, and found the petitioner hiding under a bed with a large knife and bags of crack cocaine. (*Id.* at 65:10-66:8.) The police arrested the petitioner, and took him to the 72nd precinct. (ECF No. 9-2 at 316:17-21.) Detectives advised him of his constitutional rights, which he waived. (ECF No. 9-1 at 9:1-11:13.) He made oral, written, and videotaped statements in which he confessed to shooting London. (*Id.* at 11:14-14:19, 15:18-17:21.)

The petitioner was charged with one count of Murder in the Second Degree (N.Y. Penal Law § 125.25[1]), and two counts of Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law § 265.03[3]; 265.03[1][b]). (ECF No. 9-3 at 27.)[2]

    2. Suppression Hearing

The defense moved to suppress his statements. (*See generally* ECF No. 9-1.) On September 29 and 30, 2009, the Honorable Alan Marrus held a combined Huntley/Dunaway hearing on the petitioner's motion. (*Id.*) The prosecution called two witnesses—Detective Albert Lamoglia of the 72nd precinct and Detective Carlo D'Ambrosi of the Brooklyn South Homicide Squad. (*Id.* at 3-75.) Lamoglia testified that he received a telephone tip on December 21, 2007, that the petitioner was located in a house at 5816 Sixth Avenue. (*Id.* at 62:15-63:10.) Detective Lamoglia and other detectives entered the house around 3:30 p.m. (*See id.* at 64:22-65:9, 73:20-22.) The petitioner was hiding under a bed; also under the bed was a "very large knife" and a number of Ziploc bags containing what appeared to be crack cocaine. (*Id.* at 65:18-66:8.) Lamoglia brought the petitioner to the 72nd precinct, and placed him in an interview room. (*See id.* at 73:2-4.)

---

[2] The petitioner was charged in a separate indictment with narcotics possession. (*See* ECF No. 9-2 at 464:1-466:13.)

Detectives D'Ambrosi and Elson Winchester questioned the petitioner at the 72nd precinct. (*Id.* at 8:17-22.) At 7:50 p.m., Detective Winchester advised the petitioner of his rights; the petitioner said that he understood his rights and agreed to answer questions.[3] (*Id.* at 9:1-11:13.) The petitioner said that the deceased had menaced him with a gun on the Friday before the shooting. (*Id.* at 23:12-13.) Two days later, the petitioner saw the victim in front of 537 49th Street, and shot him because he thought London was retrieving a gun from a car.[4] (*Id.* at 11:19-24.) At 9:15 p.m., Detective D'Ambrosi transcribed the petitioner's written statement, which the petitioner signed. (*Id.* at 12:1-14:19.) Later that night, the petitioner gave a videotaped statement to Assistant District Attorney Lawrence Fredella. (*Id.* at 15:18-17:21.)

The petitioner's trial counsel, James Koenig, argued that the police did not have probable cause to arrest the petitioner, and that the fruits of the arrest—the confession and the drugs and drug paraphernalia—should be suppressed. (*Id.* at 77:1-78:3.)

Judge Marrus denied the motion, ruling that the evidence known to the police—London's statement that "Holy" shot him, confirmation that the petitioner used the name Holy, the call informing police that London's murderer was in a house at 5816 Sixth Avenue, and the petitioner's presence at that address—established probable cause. (*Id.* at 80:17-82:4.) Even if the police had lacked probable cause, "any taint from lack of probable cause" was attenuated, because of the time between the arrest and the petitioner's statements, which were preceded by *Miranda* warnings.[5] (*Id.* at 82:4-15.)

---

[3] Detective Winchester used a *Miranda* form. (ECF No. 9-1 at 9:7-11.) The petitioner initialed his answers to each right, and signed the form. (*See id.* at 9:21-25.)
[4] The petitioner initially denied shooting London. (*Id.* at 45:16-25.)
[5] The voluntariness of the petitioner's statements was not an issue at the hearing. (*Id.* at 83:2-3.)

3. Trial

The petitioner went to trial before Judge Marrus and a jury on October 5, 2009. (*See* ECF No. 9-2 at 1.) The prosecution's witnesses included Troy London's mother Della London, Milton Lewis, who was with London on the day of the murder, the petitioner's friends Ismael Ortiz and Alex Rodriguez, Police Officer Xiang Li, ballistics Detective John Kraljic, Crime Scene Unit Detectives Anthony Seguinot and Carlos Pantoja, EMT Vincent Maneri, Detective D'Ambrosi, ADA Fredella, and Dr. Frede Frederic of the Office of Chief Medical Examiner. (*See* ECF No. 9-2 at 20-285.)

### a. Della London

Della London testified that on November 3, 2007—two days before the shooting—she saw the petitioner, whom she knew as "Holy," on a stoop about four doors from her home; her son Troy was outside on her stoop. (*Id.* at 21:19-22:24, 23:11-16.) Two days later, on November 5th, she was on the third floor of her building in her bedroom. (*Id.* at 24:4-11.) She heard gunshots, and ran to her window; her son looked up at her and said, "Ma, I just got shot, call 911." (*Id.* at 24:4-18.) Ms. London immediately called 911, ran down to the lobby, and found her son collapsed on the floor.[6] (*Id.* at 24:24-25:6, 29:3-5.) She asked her son, "Who did this?" (*Id.* at 25:17.) He replied that Holy "shot me and ran down the street with a red hoodie on." (*Id.* at 25:18-22.) She later told the investigating officers what her son had said. (*Id.* at 28:13-15.)

### b. Milton Lewis

Milton Lewis, Troy London's friend, testified that on the day of the shooting, he saw the petitioner on the same block as London's building wearing a red hoodie. (*Id.* at 41:13-42:6,

---

[6] Ms. London had finished speaking with the 911 operator by the time she got down to see her son. (*Id.* at 29:16-17, 33:24-34:10.)

5

54:12-15.) Lewis and London were sitting in a truck in front of London's building. (*Id.* at 42:7-17.) At one point, after Lewis went into London's building, he heard gunshots. (*Id.* at 48:25-49:8.) London stumbled into the building, and said, "Holy shot me." (*Id.* at 49:12-50:1, 53:23-54:2.) He then collapsed. (*See id.* at 49:25-50:3.) Ms. London asked her son who shot him; London told her Holy shot him, and that Holy was wearing a red hoodie. (*Id.* at 50:6-21, 54:6-11.)

On cross-examination, the petitioner's counsel confronted Lewis with his written statement to the police in which he said that London identified "Carlos" as the shooter. (*Id.* at 71:24-72:3, 78:16-24.) Lewis testified that detectives used the name "Carlos," so he assumed that Carlos was Holy's real name. (*Id.* at 75:5-13, 78:25-79:2, 79:22-25.)

### c. Ismael Ortiz

Ismael Ortiz, the petitioner's "good friend," testified that on November 2, 2007, the petitioner and Ortiz were with a friend named Zeen. (*Id.* at 103:10-12, 116:16-118:1.) London's younger sister walked by, and Zeen said, "God bless you, chocolate." (*Id.* at 118:1-5.) London and Brian Young confronted Zeen, and Young and Zeen "started screaming at each other." (*Id.* at 118:8-119:18.) Young threw either coffee or liquor in Zeen's face, and Zeen pulled out a knife. (*Id.* at 119:18-22, 120:5-16.) London pulled out a gun, waved it around, and shot it in the air. (*Id.* at 120:17-121:7.) Before London walked away, he pointed the gun directly at the petitioner. (*Id.* at 121:8-16, 121:25-122:8.) At about 9:00 p.m. on November 5, 2007, the petitioner arrived at Ortiz's house on 5816 Sixth Avenue. (*Id.* at 102:20-103:24.) The petitioner was carrying a rolled-up shirt; Ortiz did not see what was in the shirt, but thought that it was a gun. (*Id.* at 104:10-18, 113:23-114:5.) The petitioner told Ortiz he was walking down the block,

and that "when he was going to take Fifth Avenue, he seen the guy [London] reaching in his truck. He panicked and he shot him." (*Id.* at 112:23-113:18.)

The petitioner's counsel established on cross-examination that the police arrested Ortiz, and told him that he could be charged with possessing the drugs found under his bed. (*Id.* at 122:10-123:2, 124:24-125:5.) Detective D'Ambrosi promised that he would be released if he cooperated in the murder investigation. (*Id.* at 127:16-128:1.) Detective D'Ambrosi told Ortiz that the petitioner made a written statement, that the petitioner felt remorse, and that the detective needed Ortiz's statement to "seal the case." (*Id.* at 128:19-130:19, 132:8-22.)

### d. Alex Rodriguez

Alex Rodriguez, Ortiz's brother and the petitioner's friend, testified that on the night of the shooting, the petitioner came to his home at 5816 Sixth Avenue; the petitioner was holding a shirt that looked like it had something in it.[7] (*Id.* at 134:9-18, 135:25-136:13, 137:19-21, 138:17-139:17.) The petitioner said that he shot London because London was "trying to do something to" him. (*Id.* at 137:2-8.) According to Rodriguez, "the kid [London] went to get in his car . . . maybe to try to grab a gun or something like that." (*Id.* at 137:25-138:7.)

As he had with Ismael Ortiz, the petitioner's counsel cross-examined Rodriguez about what the police told him when the petitioner was arrested—that his brother, Ortiz, could be charged for the drugs they found under the bed, which Rodriguez could prevent if he cooperated.

---

[7] Detective Winchester documented a December 19, 2007 interview with Alex Rodriguez. (ECF No. 1-2 at 128.) Rodriguez told Winchester that the petitioner went to Rodriguez's house the night of London's murder with a "t-shirt with [an] object . . . which made a thump sound;" Rodriguez believed that the petitioner had a gun. (*Id.*) The petitioner told Rodriguez that he shot London after London appeared to be reaching for a gun in his truck. (*Id.*) According to the report, ADA Fredella took an audiotaped statement from Rodriguez. (*Id.*) Neither the report nor the audiotaped statement were introduced into evidence.

(*Id.* at 145:3-16.) Rodriguez was released from custody after he made his statement.[8] (*Id.* at 145:17-23.)

### e. *Police Officer Xiang Li*

Officer Xiang Li was the first officer on the scene of the shooting. (*See id.* at 150:24-152:10.) When he arrived, Troy London was not conscious. (*Id.* at 152:5-13.) No one told Officer Li about London's statement, but he was not there as an investigator. (*Id.* at 158:14-21, 159:13-19.)[9]

### f. *EMT Vincent Maneri*

Vincent Maneri, the emergency medical technician who responded to the all call of the shooting, testified that when he and his partner arrived at the building, London and other people were in the foyer. (*Id.* at 199:13-20.) London was initially conscious, but at one point appeared to have "taken his last breath."[10] (*Id.* at 200:2-7.)

### g. *Detective Carlo D'Ambrosi*

Detective D'Ambrosi testified that he and Detective Winchester questioned the petitioner after he was arrested. (*Id.* 211:21-213:1.) After Detective Winchester advised the petitioner of his rights, Detective D'Ambrosi asked the petitioner some preliminary background questions. (*Id.* at 213:2-9, 215:24-216:16.) When D'Ambrosi asked about the "incident that occurred on 49th street," the petitioner said he did not know what D'Ambrosi was talking about. (*Id.* at 217:2-13.) D'Ambrosi and Winchester left the room. (*Id.* at 217:16.) When D'Ambrosi

---

[8] According to a November 7, 2007 homicide investigation report, an unnamed witness stated that "[w]ord is that Alex Rodriguez is the shooter." (ECF No. 1-2 at 137.) The report did not come into evidence.

[9] Detective John Kraljic, a ballistics expert, and Detectives Anthony Seguinot and Carlos Pantoja from the Crime Scene Unit, testified about their observations. (*See id.* at 160:20-197:10.) Detective Seguinot testified about his search of the crime scene, and Detective Pantoja testified about his search of London's car. (*See id.* 177:17-197:10.)

[10] A November 11, 2007 police report, which was not in evidence, summarized EMT Maneri's statement: "EMT Minari [sic] states that the he [sic] asked what happened. The victims [sic] mother stated that we know who did it. The guy tried to get fresh with with [sic] her daughter a few days ago, she further states that her son approached the deft. concerning this incident." (ECF No. 1-2 at 178.)

8

returned, he spoke to the petitioner again, and the petitioner told him "exactly what happened." (*Id.* at 217:16-18.) The petitioner said that a few days before the shooting, London threatened him with a gun, warned him not to "mess" with London's sister, and fired the gun in the air. (*Id.* at 217:23-218:5.) On the day of the shooting, the petitioner was hanging out on a stoop with other people. (*Id.* at 218:6-11.) London and another man were on London's stoop. (*Id.* at 218:11-12.) When London walked to a car, the petitioner thought that London was "going for a gun," so he shot London. (*Id.* at 218:13-15.)

D'Ambrosi told the petitioner that "we need to put this on paper." (*Id.* at 219:1-6.) The petitioner asked the detective to write the statement, which D'Ambrosi did. (*Id.* at 219:1-8.) The written statement included the following:

- The petitioner "states that while in front of 551 49th Street he observed two male blacks on the stoop of 537 49th Street." (*Id.* at 220:25-221:2.)

- "He states that both male blacks were going back and forth into the building and the auto. At some point he observed victim going into the auto by himself, which he believes the male black was going into the auto to get a gun." (*Id.* at 221:10-14.)

- "I asked about how he knew the male black to have a gun. He stated that the previous Friday there was an incident. That the victim had menaced Rolando. After the menacing incident the male black fired two shots in the air. As the victim was entering the passenger's side of the Escalade, Rolando walked up behind the victim firing five shots into the victim." (*Id.* at 221:15-22.)

- "At this time, he ran . . . . His final destination was 5816 Sixth Avenue, first floor, home of Milo and Alex Rodriguez. . . . Rolando was wearing a black do-

rag on his head, red hooded sweatshirt with a zipper, jeans and sneakers." (*Id.* at 221:25-222:9.)

- "States that the gun is under the Verrazano Bridge where he threw it." (*Id.* at 222:10-11.)

On cross-examination, the petitioner's counsel asked Detective D'Ambrosi whether he showed the petitioner's written confession to Ismael Ortiz, and told him that the petitioner had confessed to murder, that he could be charged with drug possession, and that he could "help" the petitioner if he told D'Ambrosi "what he knew about the homicide." (*Id.* at 230:9-24.) D'Ambrosi did not remember doing any of those things, or telling Alex Rodriguez that he could charge Rodriguez's brother with possessing the drugs if Rodriguez did not tell D'Ambrosi about the murder. (*Id.* at 230:9-231:5.)

### h. Assistant District Attorney Lawrence Fredella

ADA Fredella testified about the petitioner's video-taped statement, which the prosecution played for the jury. (*See id.* at 260:22-264:10.)[11]

### i. Petitioner

After the prosecution rested, the petitioner testified. (*Id.* at 287.) He said he had been a drug dealer for about ten years. (*Id.* at 293:19-21.) On November 2, 2007, he had "just finished seeing a customer for some drugs" when he ran into some friends, including Louis Delgado (known as Zeen) and Ismael Ortiz. (*Id.* at 297:6-298:17.) Troy London and his friend Brian Young (known as Chip), and London's younger sister approached them. (*Id.* at 299:3-11.)

---

[11] Dr. Frede Frederic, from the Office of Chief Medical Examiner, testified about the autopsy on London. (*See* ECF No. 9-2 at 268:21-285:13.) Dr. Julia de LaGarza-Jordan performed the autopsy. (*Id.* at 272:5-19.) Dr. Frederic's testimony was based on his review of Dr. LaGarza-Jordan's records, including the autopsy report. (*Id.* at 272:20-22.) London was shot three times; once in the left buttock, once in the side of his chest, and the third was a graze wound. (*Id.* at 274:22-275:1.) Soot inside the entrance wound established that the gun was less than seven inches from London when it was fired. (*Id.* at 277:7-278:25.)

London pulled out a gun, and asked "who did it, which one?" (*Id.* at 299:12-300:2.) He then said to Zeen, "This is my sister. This is a younger girl. How are you going to talk to a young girl like that. You disrespecting her." (*Id.* at 300:13-23.) Young and Zeen started to fight; "Young [was] punching [Zeen] in the face and throwing some coffee or something." (*Id.* at 301:7-21.) London "just started waiving the gun at everybody." (*Id.* at 301:22-24.) He said, "You disrespect my sister I'll kill you all," and then shot the gun in the air. (*Id.* at 301:25-302:19.)

On November 5th, the day of the murder, the petitioner left his father's house, and drove to various parts of Brooklyn to sell drugs. (*Id.* at 309:3-9, 376:1-21.) The police never came to the house in connection with London's shooting, but the petitioner's girlfriend Vanessa told him that the police wanted to talk to him. (*Id.* at 311:21-312:9, 313:7-9.)

On December 21, 2007, the petitioner was with Ortiz and Rodriguez at their house on Sixth Avenue. (*See id.* at 314:4-7.) Police officers arrived at the house at about 3:30 p.m. (*See Id.* at 314:8-15.) The petitioner hid under the bed. (*Id.*) He was arrested and taken to the 72nd precinct. (*Id.* at 316:22-317:2.) Detectives Winchester and D'Ambrosi started questioning him about an hour after he arrived. (*Id.* at 319:8-11, 321:14-19.) The petitioner repeatedly asked if he could call his family or talk to a lawyer, but he was never permitted to do so.[12] (*Id.* at 326:24-327:16, 332:18-333:8, 334:9-12, 335:1-4, 374:16-25.) For the first half hour, the detectives asked about but did not accuse him of London's murder. (*Id.* at 323:14-325:23, 326:20-23.) The petitioner said the "word on the street" was that Zeen or Alex Rodriguez killed London. (*Id.* at 328:16-19.) The detectives then left the interview room for about an hour. (*Id.* at 331:14-18.) When they returned, D'Ambrosi told the petitioner that they had "enough evidence to

---

[12] According to the December 22, 2007 arrest report, the petitioner made three telephone calls on December 21st at 6:00 p.m. (ECF No. 1-2 at 162.) The report was not introduced or used at the Huntley/Dunaway hearing or at trial.

11

incriminate [him] for murder and drugs." (*Id.* at 332:13-333:3.) When the petitioner asked again if he could call his lawyer and family, Winchester refused and yelled that he faced 50 years to life in prison. (*Id.* at 333:4-8, 334:3-335:4.)

The detectives left him alone in the room again, and D'Ambrosi returned by himself. (*Id.* at 337:6-7, 339:13-15.) D'Ambrosi asked him about the November 2nd incident in which London threatened the petitioner with the gun. (*See id.* at 339:16-340:10.) At that point, D'Ambrosi left the petitioner alone in the interview room again for about 20 to 30 minutes. (*Id.* at 340:11-16.)

When D'Ambrosi returned, he offered to help the petitioner "turn this murder into self-defense," and said he could "run the drugs concurrent which is ten to seven years." (*Id.* at 345:12-15.) If the petitioner cooperated, the detective would introduce him to "the D.A," and the petitioner would get "no more than five years and a possibility of bail when I see the judge." (*Id.* at 345:15-19.) D'Ambrosi also told him he could not contact anyone until the "deal" was done. (*Id.* at 346:18-19.) D'Ambrosi warned that if the petitioner did not cooperate, he would "be doing life in prison." (*Id.* at 347:7-13.) The detective "talked about" the petitioner's baby, and asked whether the petitioner wanted "to do life in prison for a piece of shit and have your daughter without her father or do you want to make this deal and be a father to your daughter." (*Id.* at 347:13-19.) The petitioner was scared, and decided to confess to the murder. (*See id.* at 347:19-20.)

Up to this point, no one had advised him of his rights. (*See id.* at 348:10-351:25.) Just before ADA Fredella arrived, D'Ambrosi gave him a sheet with the *Miranda* warnings; he told him to sign it without reading it, which the petitioner did. (*Id.* at 349:2-6.) The petitioner's statement to ADA Fredella was videotaped, and the petitioner was read his rights at the

beginning of the video recording. (*Id.* at 357:6-10.) The petitioner told the ADA that he had previously been advised of his rights. (*See id.* at 383:14-19.)

### j. Verdict

On October 13, 2009, the jury found the petitioner guilty of Murder in the Second Degree (N.Y. Penal Law § 125.25[1]). (*Id.* at 459:22-460:3.)

### k. Sentence

On November 4, 2009, Judge Marrus sentenced the petitioner to 25 years to life in prison. (*Id.* at 476:5-6.)[13]

## PROCEDURAL HISTORY

### 1. Direct Appeal

In June of 2011, the petitioner, represented by counsel, appealed his conviction to the New York Supreme Court, Appellate Division, Second Department. (ECF No. 9-3 at 1-23; *see also* ECF No. 1 at 13.) The petitioner challenged Judge Marrus' conclusion that the police had probable cause to arrest him. (ECF No. 9-3 at 12-18.) He also claimed that the prosecutor "bolstered" witnesses during his cross-examination of the petitioner, and that his sentence was excessive. (*Id.* at 18-22.) On May 11, 2012, the petitioner filed a *pro se* supplemental brief asserting that his trial lawyers were ineffective, that his statements to the police were involuntary, and that the prosecution withheld *Rosario* and *Brady* material.[14] (*Id.* at 118-147.)

---

[13] The defendant also pled guilty to narcotics possession with intent to sell; Judge Marrus promised to sentence him to a year in prison, concurrent with the sentence for the murder. (*See* ECF No. 9-2 at 464:22-468:3.)

[14] On April 1, 2012, the petitioner moved, pursuant to N.Y. Civil Practice Law & Rules § 2307, for a subpoena duces tecum ordering the prosecution to produce an arrest warrant; the petitioner based this submission on an entry on the Grand Jury Synopsis Sheet, which said that Detective Albert Lamoglia executed an arrest warrant when the petitioner was arrested. (ECF No. 9-3 at 77-78.) The prosecution responded that the entry was a mistake, and that there was no arrest warrant. (*Id.* at 92-93.) On June 8, 2012, Judge Marrus dismissed the petitioner's application as moot. (*Id.* at 94.)

On December 26, 2012, the Appellate Division unanimously affirmed the petitioner's conviction. *People v. Candelaria*, 956 N.Y.S.2d 506 (2d Dep't Dec. 26, 2012). The Appellate Division rejected the petitioner's probable cause argument. (*Id.* at 507-08.) The court found that the bolstering claim was unpreserved, and was in any event meritless, but that any error was harmless because of the overwhelming evidence of the petitioner's guilt. (*Id.* at 507-08.) The court also rejected the petitioner's excessive sentence claim. (*Id.* at 508.) Because the petitioner's ineffective assistance of counsel claim was based in part on facts outside the record, the court held that it was not the proper subject of a direct appeal and should be raised in a CPL § 440.10 motion. (*Id.*) The court noted, however, that "[i]t is not evident from the matter appearing on the record that the [petitioner] was deprived of the effective assistance of counsel." (*Id.*) Finally, the court held that the other claims raised in the *pro se* supplemental brief were "unpreserved for appellate review and, in any event, without merit, or . . . based on matter dehors the record." (*Id.*)

The Court of Appeals denied the petitioner's application for leave to appeal on May 2, 2013. *People v. Candelaria*, 990 N.E.2d 138 (N.Y. Ct. App. May 2, 2013).

2. 440.10 Motion

The petitioner moved to set aside his conviction pursuant to CPL § 440.10, arguing that the prosecution withheld *Rosario* and *Brady* material, and elicited "fraudulent" testimony which "bolstered" the prosecution's witnesses. (ECF No. 1-2 at 8-47.) The petitioner also claimed that he was innocent, and that his lawyer was ineffective. (*Id.* at 49-58.)

In a written decision on April 2, 2014, Judge Marrus denied the motion. (ECF No. 1 at 17-18.) Judge Marrus found the petitioner's allegation that the prosecution failed to disclose prior statements of witnesses was refuted by his lawyer's affirmation, and by other documentary

evidence. (*Id.* at 17.) Moreover, some of the material did not qualify as either *Rosario* or *Brady* material because it "d[id] not constitute prior statements of witnesses who testified at the hearing or trial or contain material evidence which creates a reasonable doubt about the [petitioner]'s guilt." (*Id.*) Finally, the court found that there was overwhelming evidence presented of the petitioner's guilt, and that none of his lawyers' alleged errors constituted ineffective assistance of counsel. (*Id.* at 18.)

On April 21, 2014, the petitioner sought leave to appeal Judge Marrus' decision, which the Appellate Division denied on August 7, 2014. (ECF No. 9-3 at 547.)

The petitioner filed this *pro se* habeas petition on April 23, 2014.[15] (ECF No. 1.) The respondent filed a response on December 15, 2014. (ECF No. 9.) On March 20, 2015, the petitioner filed a traverse/reply.[16] (ECF No. 13.)

On February 28, 2018, the petitioner filed a motion to compel discovery under Rule 6 of the Rules Governing Section 2254 Proceedings and to stay the proceeding pending disclosure of the requested discovery materials. (ECF No. 17.) The respondent opposed the motion on April 26, 2018. (ECF No. 18.) The petitioner replied on May 16, 2018. (ECF No. 19.)

## LEGAL STANDARD

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires a federal court reviewing a state prisoner's habeas petition to give deference to a state court's decision on the merits. 28 U.S.C. § 2254(a). The federal court may not issue a writ of habeas corpus unless the state court's decision was "contrary to, or involved an unreasonable application

---

[15] This case was originally assigned to the Honorable Nicholas G. Garaufis. (*See* ECF No. 4.) It was re-assigned to me on November 23, 2015.
[16] On April 7, 2015, the petitioner moved to stay the habeas petition pending his application to Judge Marrus for leave to renew his motion to vacate judgment. (ECF No. 14.) On September 26, 2016, I denied the motion to stay because Judge Marrus denied the petitioner's application to renew his motion to vacate. (*See* ECF No. 16 at 6.)

of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *see also Johnson v. Williams*, 568 U.S. 289, 292 (2013); *Chrysler v. Guiney*, 806 F.3d 104, 116-17 (2d Cir. 2015).

For the purposes of federal habeas review, "clearly established law" means "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" or an "unreasonable application of" clearly established law if the decision: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable" facts; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Id.* at 412-13. The court reviews the last reasoned state court decision. *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Jones v. Stinson*, 229 F.3d 112, 118 (2d Cir. 2000). The state court's factual determinations are presumed to be correct, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

A petitioner can seek federal habeas corpus relief only after he exhausts state court remedies, giving the state courts a fair and full opportunity to review the merits of the claim. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). In other words, a petitioner must present "the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it." *Jackson v. Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

## DISCUSSION

### 1. Motion to Compel Discovery and Stay Proceedings

The petitioner seeks an order compelling the government to provide him with any "disclosable materials," including Crime Victims Assistance Unit reports, cooperation agreements, and police reports.[17] (ECF No. 17 at 2-3.) The petitioner claims that this material may provide exculpatory information and impeachment material, and could show that the government's witnesses received benefits in exchange for their testimony. (*Id.* at 4-5.) The petitioner also requests a stay upon receipt of these materials so that he can exhaust additional claims in state court. (*Id.* at 5.)

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley,* 520 U.S. 899, 904 (1997); *see also Drake v. Portuondo,* 321 F.3d 338, 346 (2d Cir. 2003). A court may authorize discovery under Rule 6 of the Rules Governing Section 2254 cases "for good cause shown." 28 U.S.C. § 2254, Rule 6(a). "A petitioner bears a heavy burden in establishing a right to discovery." *Pizzuti v. United States*, 809 F. Supp. 2d 164, 176 (S.D.N.Y. 2011) (internal quotation marks and citation omitted). To establish good cause, the petitioner must present specific allegations that provide "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy,* 520 U.S. at 908-09 (quoting *Harris v. Nelson,* 394 U.S. 286, 300 (1969)) (alteration in original). Denial of a discovery request is appropriate "where the petitioner provides no specific evidence that the requested discovery

---

[17] The petitioner states that he made a Freedom of Information Law Request for reports and documents from the Crime Victims Assistance Unit or similar divisions, including cooperation agreements, which was denied because the petitioner's habeas petition was pending. (ECF No. 17 at 2-3, 22-25.)

would support his habeas corpus petition." *Hirschfeld v. Comm'r of the Div. of Parole*, 215 F.R.D. 464, 465 (S.D.N.Y. 2003) (citation omitted).

The petitioner has not made the requisite showing that he might be entitled to relief if the facts were more fully developed through the discovery he seeks. He requests police reports that were produced during the state criminal proceedings below, and has not established that the reports were not turned over as part of discovery. The government responds that it has "no records of any cooperation agreements nor any material benefits having been provided by respondent to . . . prosecution witnesses in return for their testimony at petitioner's trial." (ECF No. 18 at 2.) Moreover, even if there were any such information, it would not have changed the outcome of the trial. Accordingly, the petitioner's requests for discovery and a stay are denied.

### 2. *Brady* Claims[18]

The petitioner argues that the prosecution "withheld police report statements by trial witnesses" and "witnesses['] exculpatory statements" in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (ECF No. 1 at 5.) In particular, the petitioner claims that the prosecution did not disclose a police report containing a statement by EMT Vincent Maneri: "Minari [sic] states that he asked what happened. The victims [sic] mother stated that we know who did it. The guy tried to get fresh with with [sic] her daughter a few days ago, she further states that her son approached the deft. concerning this incident." (*Id.*; *see also* ECF No. 1-2 at 178.) The petitioner also argues that the prosecution did not disclose Detective Winchester's report of his interview of Alex Rodriguez or Rodriguez's audiotaped statement to ADA Fredella. (ECF No.

---

[18] The petitioner also argues that the prosecutor did not comply with discovery obligations in violation of *People v. Rosario*, 173 N.E.2d 881 (N.Y. Ct. App. 1961). (*See* ECF No. 13 at 2.) *Rosario* claims are state claims, and not cognizable on federal habeas review. *See* 28 U.S.C. § 2254(a) (providing for federal habeas relief based on violations of federal law); *see also, e.g., Kotler v. Woods*, 620 F. Supp. 2d 366, 395 (E.D.N.Y. 2009) ("[T]o the extent that [a state habeas] claim is based on a *Rosario* violation, it must fail.").

13 ¶ 5.)  The petitioner says that this evidence was favorable to him "because it would have impeached the objectively [sic] and credibility of the case lead interrogator and investigator," and that he was denied "the right to the effective assistance of counsel, a fair trial, due process and equal protection of the law."  (*Id.* at 2-3 (citing *Giglio v. United States,* 405 U.S. 150, 154 (1972)).)

The petitioner raised the same claim in his appeal to the Appellate Division.  (ECF No. 9-3 at 140-47.)  The Appellate Division did not discuss the *Brady* claim in detail, but held that the "remaining contentions raised in [the petitioner's] *pro se* supplemental brief"—which include the *Brady* claim—were "unpreserved for appellate review and, in any event, without merit, or [were] based on matter dehors the record."  *Candelaria*, 956 N.Y.S.2d at 508.  Accordingly, the claim is preserved for federal habeas review.  *See Wright v. Griffin*, No. 14-CV-7559, 2017 WL 5514180, at *8 (E.D.N.Y. Nov. 16, 2017) (citing *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 810 (2d Cir. 2000)).  The petitioner also raised this claim in his 440.10 motion, which Judge Marrus denied on the merits.  (ECF No. 1 at 17-18; ECF No. 1-2 at 30-47.)  Judge Marrus' decision is entitled to AEDPA deference, and the petitioner must show that the decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

*Brady v. Maryland*, 373 U.S. 83 (1963), requires the prosecution to disclose "evidence that is both favorable to the accused and 'material either to guilt or to punishment.'"  *United States v. Bagley,* 473 U.S. 667 (1985) (quoting *Brady,* 373 U.S. at 87).  To establish a *Brady* violation, a petitioner "must show that:  (1) the government, either willfully or inadvertently, suppressed evidence; (2) the evidence at issue is favorable to the defendant; and

(3) the failure to disclose this evidence resulted in prejudice." *United States v. Kirk Tang Yuk*, 885 F.3d 57, 86 (2d Cir. 2018) (internal quotation marks omitted) (quoting *United States v. Coppa*, 267 F.3d 132, 140 (2d Cir. 2001)). Reversal is required "if there is a 'reasonable probability' that disclosure would have changed the outcome of the case, or where the suppressed evidence 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* (quoting *Kyles v. Whitley,* 514 U.S. 419, 434-35 (1995)).

The petitioner has not made such a showing in this case. Judge Marrus found that the petitioner's *Brady* claim was refuted by affirmations of his trial counsel, and "largely rebutted by the District Attorney's 'discovery file' and court-filed 'Disclosure Pursuant to CPL 240.45.'" (ECF No. 1 at 17.) Indeed, the record does not demonstrate that the government withheld either the police reports or the audiotaped statement. The record includes copies of the reports with redactions, which suggests that the government provided the reports to the petitioner's counsel as part of discovery. *See Hamilton v. Lee,* 94 F. Supp. 3d 460, 476 (E.D.N.Y. 2015), *aff'd*, 707 F. App'x 12 (2d Cir. 2017) ("The redactions that were made to the police report in question strongly suggest that the prosecutor may well have disclosed this report to the defense in the ordinary course of discovery before trial, and then, for strategic reasons, defense counsel chose not to use it in his cross-examination.") In fact, the petitioner seems to agree that his lawyers had the report with EMT Maneri's statement (*see infra* Section 4; ECF No. 1-2 at 178); his real complaint is that his lawyer did not refer to the report during the trial. In order to constitute a *Brady* violation, however, the prosecution must have withheld the information. That did not happen in this case.

20

Even if the petitioner had established that the prosecution withheld the materials, he has not demonstrated that the result would have been different. Alex Rodriguez's trial testimony was largely consistent with his statement to Detective Winchester. As for EMT Maneri's statement, it is not exculpatory in the context of the trial. According to the report, the EMT gave the following account: "The victims [sic] mother stated that we know who did it. The guy tried to get fresh with . . . her daughter a few days ago, she further states that her son approached the deft. concerning this incident." Contrary to the petitioner's claim, the report does not suggest the existence of another suspect. Nor would any of the disputed material have changed the outcome of the case. Not only did the petitioner make written and videotaped confessions to the killing, the victim identified him as the shooter to his mother and friends. Moreover, Ismael Ortiz and Alex Rodriguez, the petitioner's close friends, testified that the petitioner admitted that he shot the victim.

Judge Marrus' decision was neither contrary to nor an unreasonable application of clearly established Supreme Court law. The petitioner's request for *habeas* relief on this basis is therefore denied.

### 3. Prosecutorial Misconduct Claims

The petitioner argues that the prosecutor "knew or should have known" that Della London, the victim's mother, gave "false testimony" when she said that her son identified "Holy" as the killer. (ECF No. 1 at 6.) According to the petitioner, "Ms. London's 911 call proved she did not tell the 911 operator who the shooter was when asked." (*Id.*) The petitioner repeats his claim that the prosecutor failed to disclose EMT Maneri's statement, which his lawyer could have used to impeach Ms. London. (*Id.*) The petitioner also argues that "the

prosecution violated its constitutional duties to correct false testimony . . . by failing to correct Det. D'Ambrosi's perjured testimony." (ECF No. 13 ¶ 3.)

In his direct appeal to the Appellate Division, the petitioner raised only the claim about D'Ambrosi's testimony. (ECF No. 9-3 at 144.) Although the Appellate Division did not discuss the claim in detail, the court held that the petitioner's "remaining contentions raised in his *pro se* supplemental brief"—which include the claim about D'Ambrosi's allegedly false testimony— either were "unpreserved for appellate review and, in any event, without merit, or [were] based on matter dehors the record." *Candelaria*, 956 N.Y.S.2d at 508. This claim is preserved for federal habeas review. *See Wright*, 2017 WL 5514180 at *8 (citing *Fama*, 235 F.3d at 810).

The petitioner raised all the prosecutorial misconduct claims in his 440.10 motion. (ECF No. 1-2 at 18-28.) Judge Marrus rejected the claims on the merits, finding that the petitioner's motion did not establish prosecutorial misconduct. (ECF No. 1 at 18.) Judge Marrus' decision is entitled to AEDPA deference, and the petitioner must show that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

In *Napue v. Illinois,* 360 U.S. 264, 269 (1959), the Supreme Court held "that 'a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment.'" *Jenkins v. Artuz*, 294 F.3d 284, 292 (2d Cir. 2002) (alteration omitted) (quoting *Napue,* 360 U.S. at 269). "The threshold question is whether the evidence presented was false." *Black v. Rock*, 103 F. Supp. 3d 305, 317 (E.D.N.Y. 2015) (citing *McCants v. Hallenback,* No. 13-CV-5587, 2014 WL 4638836, at *6 (E.D.N.Y. Sept. 16, 2014)). "With respect to perjured testimony, this requires a showing that the witness gave 'false

testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory.'" *Id.* (quoting *McCants,* 2014 WL 4638836, at *6). "The petitioner has the burden of demonstrating, by a preponderance of the evidence, that the witness committed perjury." *Id.* (internal quotation marks and citation omitted). If the evidence is false or the witness committed perjury, "a conviction must be set aside if 'the prosecution knew, or should have known, of the perjury,' and 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Smith v. Herbert*, 275 F. Supp. 2d 361, 367 (E.D.N.Y. 2003) (quoting *United States v. Agurs,* 427 U.S. 97, 103 (1976)).

The petitioner has not established the threshold requirement: that Della London and Detective D'Ambrosi testified falsely. Della London's testimony about her son's identification of "Holy" as the shooter was corroborated by Milton Lewis, who also testified that London said that "Holy" shot him. That Della London did not identify the shooter to the 911 operator does not prove that her testimony was false. Della London testified that she called 911 before she went downstairs, and that she did not have her phone when her son told her that "Holy" shot him. (*See* ECF No. 9-1 at 29:16-17, 33:24-34:10.) Nor is there any support in the record for the petitioner's assertion that D'Ambrosi lied about the details of his interview with the petitioner. (*See infra* pp. 25-26.) Thus, the petitioner has not demonstrated by a preponderance of the evidence that either Della London or Detective D'Ambrosi committed perjury.

Even if the petitioner established that Della London and Detective D'Ambrosi testified falsely, he has not established that the prosecutor knew that the testimony was false, or that the disputed testimony affected the outcome of the trial. Lewis' testimony, the timing of the 911 call, and EMT Maneri's statement buttress Della London's account. And Detective D'Ambrosi's

testimony about the sequence of events is largely consistent with the other evidence about the petitioner's statements. In any case, given the considerable evidence of the petitioner's guilt, there is no reasonable likelihood that the disputed testimony affected the jury's verdict.

Accordingly, Judge Marrus' decision was neither contrary to nor an unreasonable application of clearly established Supreme Court law. The petitioner's request for *habeas* relief on this basis is therefore denied.

### 4. Right to Counsel Claims

Citing *Missouri v. Seibert*, 542 U.S. 600 (2004), the petitioner argues that the police violated his right to counsel when they questioned him. (ECF No. 1 at 8; ECF No. 13 ¶ 12.) The petitioner also claims that the prosecutor did not disclose an arrest report that documented three of the petitioner's telephone calls, a report that the petitioner says contradicts the testimony about the sequence of the investigation. (ECF No. 1 at 8; *see also* ECF No. 9-3 at 135.) The petitioner also asserts that the police did not advise him of his constitutional rights. (ECF No. 13 ¶ 12.)

The petitioner raised the same claims in his *pro se* submission to the Appellate Division. (ECF No. 9-3 at 133-39.) The Appellate Division discussed this claim generally, ruling that the petitioner's "remaining contentions raised in his *pro se* supplemental brief" were either "unpreserved for appellate review and, in any event, without merit, or [were] based on matter dehors the record." *Candelaria*, 956 N.Y.S.2d at 508. The claim is preserved for federal habeas review. *See Wright*, 2017 WL 5514180 at *8 (citing *Fama,* 235 F.3d at 810). The Appellate Division's decision is entitled to AEDPA deference, and the petitioner must show that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

### a. State Law Claims

The petitioner appears to raise the same arguments that he made on direct appeal—that his statements to the police should have been suppressed based on violations of state law. (*See* ECF No. 9-3 at 133-39 (citing *People v. Chapple*, 341 N.E.2d 243 (N.Y. Ct. App. 1975); *People v. Bethea*, 493 N.E.2d 937 (N.Y. Ct. App. 1986); *People v. Robertson*, 519 N.Y.S.2d 256 (2d Dep't 1987); *People v. Anderson*, 577 N.Y.S.2d 873 (2d Dep't 1980)).) These claims are not reviewable in a federal habeas proceeding. *See* 28 U.S.C. § 2254(a) ("[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties *of the United States.*" (emphasis added)).

### b. Miranda *Warnings*

Judge Marrus found that the detectives questioned the petitioner "after *Miranda* warnings had been given." (ECF No. 9-1 at 82:12-14.) The court also noted that counsel did not challenge the voluntariness of the petitioner's statements, or "contest that he received *Miranda* warnings," and there was no "controversy regarding his treatment in custody before he testified." (*Id.* at 83:2-7.) This conclusion is subject to the presumption of correctness. 28 U.S.C. § 2254(e)(1).

Citing an arrest report reflecting that three phone calls were made at about 6:00 p.m., the petitioner argues that Detective D'Ambrosi testified falsely about the sequence of events.[19] (ECF No. 1 at 8.) The timing of the phone calls does not establish that the detectives did not give *Miranda* warnings at 7:50 p.m., before he made his statement. The petitioner acknowledged on appeal that Detective Winchester advised him of his rights at 7:50 p.m., before the police

---

[19] In fact, the report undercuts the petitioner's claim that he was not permitted to make any calls.

questioned him.[20]  (ECF No. 9-3 at 5 ("[The petitioner] was arrested and transported to the precinct around 4 p.m.  D'Ambrosi introduced himself around 7:45 p.m.  [The petitioner] spent the intervening four hours in an interview room, and there was no evidence that he spoke with anyone during that time. . . .  At 7:50 p.m., Detective Winchester read [the petitioner] his *Miranda* rights . . . ." (internal citations omitted)).)  There is no basis to reject Judge Marrus' factual determinations—that the petitioner received *Miranda* warnings prior to his statements to the police.  *See Drake*, 553 F.3d at 239 ("A state court's findings of fact are 'presumed to be correct' unless rebutted 'by clear and convincing evidence.'" (quoting 28 U.S.C. § 2254(e)(1))).

### c.  Two-Step Interrogation

The petitioner claims that the police used an unconstitutional strategy to get him to confess:  that they advised him of his rights after they elicited a confession, and then had him repeat the confession in violation of *Missouri v. Seibert*.  (ECF No. 1 at 8.)  "Where law enforcement officers use a deliberate two-step process to obtain an unwarned confession and then issue *Miranda* warnings before obtaining a recitation of this confession, the subsequent statement must be suppressed unless curative measures were taken."  *Delesline v. Conway*, 755 F. Supp. 2d 487, 502-03 (S.D.N.Y. 2010) (citing *United States v. Carter*, 489 F.3d 528, 536 (2d Cir. 2007)).  *Seibert* bars police from "withholding *Miranda* warnings until after interrogating and drawing out a confession" in order to have the confession repeated after the *Miranda* warnings are given.  *Seibert*, 542 U.S. at 609.

As explained above, the record does not support this claim.  *See Duncan v. Fischer*, 410 F. Supp. 2d 101, 110 (E.D.N.Y. 2006) (*Seibert* is not applicable where "[t]here is no indication that the police . . . adopted any strategy to avoid *Miranda*").

---

[20] Judge Marrus noted at the Huntley/Dunaway hearing that the petitioner "received Miranda warnings, which were documented in writing and on the video."  (*See* ECF No. 9-1 at 3-5.)

Accordingly, the Appellate Division's decision was neither contrary to nor an unreasonable application of clearly established Supreme Court law. The petition for *habeas* relief on this basis is denied.

### 5. Ineffective Assistance of Counsel

The petitioner argues that his lawyer was ineffective, which denied him a fair trial. (ECF No. 1 at 9.) The specific claims are that trial counsel did not "cross-examine missing witness statements of exculpatory use," including a statement by an unknown witness that Alex Rodriguez was the shooter, and that counsel should have used the "alibi defense to contradict Detective D'Ambrosi's testimony to the 3 phone calls on the arrest report." (*Id.* at 9-10.) The petitioner also faults his lawyer's cross-examination of EMT Maneri. (*Id.* at 10.)

The petitioner raised the ineffective assistance of counsel claim on direct appeal. (ECF No. 9-3 at 118-32.) The Appellate Division rejected this claim, ruling that it was "not evident from the matter appearing on the record that the defendant was deprived of the effective assistance of counsel," but that the claim could not "be resolved without reference to matter outside the record," and that "a CPL 440.10 proceeding is the appropriate forum." *Candelaria*, 956 N.Y.S.2d at 508. The petitioner made the same claim in his 440.10 motion. (ECF No. 1-2 at 55-58.) Judge Marrus rejected the claim on the merits, finding that the petitioner did not demonstrate that his lawyer was ineffective. (ECF No. 1 at 18.) In this proceeding, the petitioner must show that Judge Marrus' decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

27

*Strickland v. Washington*, 466 U.S. 668 (1984), governs claims of ineffective assistance of counsel. To prevail, a petitioner must establish two elements: (1) "that counsel's representation fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694.

Under *Strickland*'s first prong, the petitioner must establish that his counsel's performance was "so deficient that, 'in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.'" *Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013) (quoting *Strickland*, 466 U.S. at 690). A habeas court must "strongly presume that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment, a presumption that is overcome only through a showing that counsel failed to act reasonably considering all of the circumstances." *Jackson*, 763 F.3d at 152 (internal quotation marks and citations omitted).

The petitioner must also establish that his counsel's "deficient performance prejudiced the defense" such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687, 694. "A reasonable probability is one that is sufficient to undermine confidence in the outcome, which requires a substantial, not just conceivable, likelihood of a different result." *Jackson*, 763 F.3d at 153 (internal quotation marks and citation omitted). "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011).

The Supreme Court has advised that the relevant inquiry—whether the state court's determination that counsel rendered effective assistance was an unreasonable application of

clearly established law—is "different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington*, 562 U.S. at 101. Rather, a state court must be granted a "deference and latitude that are not in operation when the case involves a review under the *Strickland* standard itself." *Id.* A federal court "must determine what arguments or theories supported, or . . . could have supported, the state court's decision," and must then determine "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* at 102. The standard was "meant" to be an exacting one; a state habeas petitioner must demonstrate that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 102-03.

Of course, the *Strickland* standard is itself an exacting one, and requires that a petitioner challenging his attorney's performance overcome the "strong presumption" that counsel's performance fell within "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Because a claim of ineffective assistance "can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, . . . the *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." *Harrington*, 562 U.S. at 105 (citations omitted).

Thus, an evaluation of counsel's performance is "highly deferential," and the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. The relevant inquiry focuses "on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696. The

"central concern is not with grading counsel's performance but with discerning whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." *United States v. Aguirre,* 912 F.2d 555, 560 (2d Cir. 1990) (internal quotations and citation omitted).

The petitioner has not established the first part of the *Strickland* test—that his counsel's representation fell below an objective standard of reasonableness. Notably, Judge Marrus, an experienced and respected trial judge, commended defense counsel for his "excellent legal representation." (ECF No. 1 at 18.) Nevertheless, the petitioner argues that his counsel should have cross-examined "missing witness statements of exculpatory use," which I interpret as an argument that counsel should have confronted witnesses with their previous statements. Counsel's decision not to confront Rodriguez with an anonymous allegation that he was the shooter was not an unreasonable strategy. As for the police reports about the phone calls and EMT Maneri's statement, neither document was exculpatory.

Moreover, even if the petitioner's counsel had made mistakes, there was no prejudice. The evidence against the petitioner—which included his confessions to the murder and the testimony of multiple witnesses—was convincing, and there is no probability that the jury would have acquitted the petitioner had his lawyer utilized a different strategy.

6. Evidentiary Hearing

The petitioner argues that Judge Marrus should have held an evidentiary hearing on the petitioner's newly discovered evidence claim in his 440.10 motion that David Jiminez, who lived across the street from London, described three people outside his home just before the gunshots.

(ECF No. 13 ¶¶ 7-11.) The petitioner claims that the "new evidence indicat[es] his actual innocence of the crime of which he was convicted." (*Id.* ¶ 10.)

While Judge Marrus did not specifically mention David Jiminez, he rejected the petitioner's newly-discovered evidence argument. (*See* ECF No. 1 at 18.) This decision is also entitled to AEDPA deference, and the petitioner must show that the decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

First, the failure to hold a hearing is not a constitutional claim cognizable in a federal habeas proceeding. *Corchado v. Rabideau*, 576 F. Supp. 2d 433, 443 (W.D.N.Y. 2008) ("[F]ederal habeas relief is not available to redress alleged procedural errors in state post-conviction proceedings." (internal quotation marks and citations omitted)). Thus, the petitioner's claim that he is entitled to habeas relief just because Judge Marrus did not hold an evidentiary hearing is not cognizable on habeas review.[21]

In any case, the petitioner's claim fails because he has not established that the report is newly discovered. Nothing in the record suggests that the evidence was withheld from the petitioner's counsel. *See Rustici v. Philips*, 497 F. Supp. 2d 452, 466-67 (E.D.N.Y. 2007), *aff'd sub nom. Rustici v. Phillips*, 308 F. App'x 467 (2d Cir. 2009) (newly discovered evidence claim fails where evidence is not newly discovered based on the fact that "there is nothing in the record

---

[21] The failure to hold a hearing does not violate New York's Criminal Procedure Law, which provides that courts may deny a Section 440 motion on the merits without conducting a hearing if "[t]he moving papers do not allege any ground constituting legal basis for the motion." CPL § 440.30(4)(a). "Whether or not to hold a hearing on a motion to vacate judgment upon the ground of newly discovered evidence is discretionary with the court to which the motion is addressed." *People v. Crimmins*, 343 N.E.2d 719 (N.Y. Ct. App. 1975), *overruled on other grounds by People v. Jones*, 26 N.E.3d 754 (N.Y. Ct. App. 2014) (citations omitted). A hearing is not required "where the court is able to reach its conclusion on the papers alone," because to do so "would serve no end of justice but would only protract futile litigation." *Id.* (citations omitted).

that suggests that [the] evidence was not available during the trial or that it could not have been discovered at that time"). On the contrary, the report at issue is stamped with a production number, which suggests that the prosecutor turned it over to the defense.

Even if the evidence were "newly discovered," the petitioner has not met the "extraordinarily high" burden to establish actual innocence based on the purportedly new evidence. *See Herrera v. Collins*, 506 U.S. 390, 417 (1993). The petitioner must "show a fair probability that, in light of all the evidence . . ., the trier of the facts would have entertained a reasonable doubt of his guilt." *Id.* at 442 (internal quotations omitted) (alteration in original). David Jiminez's statement does not prove actual innocence.

Judge Marrus' decision was neither contrary to nor an unreasonable application of clearly established Supreme Court law. The petitioner's request for *habeas* relief on this basis is therefore denied.

## CONCLUSION

The petition for writ of habeas corpus is denied in its entirety. The case is dismissed. A certificate of appealability will not be issued. *See* 28 U.S.C. § 2253(c).

**SO ORDERED.**

s/Ann M. Donnelly

Ann M. Donnelly
United States District Judge

Dated: Brooklyn, New York
September 28, 2018